UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANET D. GILDNER,

                Plaintiff,              CASE NO.:2:06-CV-14819

vs.                             HONORABLE JOHN FEIKENS
                                 HONORABLE JUDGE STEVEN D. PEPE

MICHAEL J. ASTRUE
COMMISSIONER OF SOCIAL SECURITY,
                Defendant.
_____/

*AMENDED*
REPORT AND RECOMMENDATION

1.      **Background**

      Plaintiff, Janet Gildner, brought this action under 42 U.S.C. §405(g) and §1383(c)(3) to challenge a final decision of the Commissioner finding that Plaintiff was not entitled to Disability Insurance Benefits (DIB) under Title XVI of the Social Security Act.[1]  Plaintiff filed a motion to remand the administrative law judge's decision  and award of benefits.  Defendant filed a motion for summary judgment.  Both motions have been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, it is recommended that the Commissioner's motion for summary judgment be **GRANTED** and the Plaintiff's motion for summary judgment be **DENIED**.

A.      **Procedural History**

      Plaintiff applied for Supplemental Security Income (SSI) Benefits on December 19,

---

[1]Plaintiff was apparently short of Title II insured statute by four quarters of coverage (R. 60).

2003,[2] alleging that she became disabled on November 15, 2002[3] (R. 65-67). Plaintiff's

application was denied on April 29, 2004 (R. 29-32), after which Plaintiff filed a request for

hearing on June 9, 2004 (R. 37). Plaintiff appeared before Administrative Law Judge ("ALJ")

William E. Decker for a hearing on May 18, 2006 (R. 451-502). ALJ Decker issued his decision

on June 27, 2006, finding Plaintiff not eligible for Social Security benefits (R. 10-26). The

Appeals Council affirmed the ALJ's Decision denied review on August 25, 2006 (R. 4-7).

**B.** **Background Facts**

    **1.** ***Plaintiff's Hearing Testimony and Statements***

Plaintiff was born in Long Beach, California on February 2, 1956, is married and has one

minor child living at home (R. 454-55). Her disability began on December 18, 2002, after an

emotional blow-up (R. 456). Following that "blow-up," Plaintiff worked sporadically as a parts

checker for the Lear Corporation earning $2,100 in 2003 and $2,156 in 2004. The job required

only four or five hours a day and was largely sedentary involving lifting no more than 20 pounds

(R. 457).

Plaintiff had previously worked at Reptron performing three jobs: (1) parts work bending

wires; (2) hand assembly; and (3) hand soldering on circuit boards (R. 459-60). Plaintiff held

each job at Reptron successively for a period of 3 or 4 months (R. 462). Plaintiff worked at

Reptron just one year.

---

[2]An earlier application was filed in December 2002 (R. 61-63).

[3]Plaintiff's Motion for summary judgment (Dkt. # 13) lists November 15, 2002, as the onset of Plaintiff's disability, but Plaintiff, in her hearing before ALJ Decker, stated that her onset of disability was December 18, 2002 (R. 456).

Plaintiff first experienced back pain when she slipped and fell as a high school student. Her back pain worsens when working and performing heavy lifting (R. 468). Sitting for more than 30 to 45 minutes increases her pain. Plaintiff experiences pain from arthritis in her tailbone and knees, which is treated with Motrin and heating pads (R. 469).[4] Plaintiff can walk a mile in about 45 minutes, lift up to 15 pounds, sit or stand for about 30 minutes without changing positions, and can be on her feet for about one hour during an eight-hour workday (R. 471).

Plaintiff suffers from hearing loss, and probably needs hearing aids (R. 470). Plaintiff sees a psychiatrist every two months for a medication review, attends weekly support group counseling, but has not been able to attend individual counseling because there had been a shortage of therapists at her clinic (R. 474).[5]

Plaintiff obtains ten hours of sleep nightly, but usually gets up at least once (R. 475). She often simply stays in bed so that she does not feel alone (R. 487). Plaintiff has problems concentrating and staying on task, and does not think she could return to her past work (R. 475-477). Plaintiff can perform about 15 to 20 minutes of housework before becoming distracted, and admitted to having three or four crying spells per week (R. 478, 481). Plaintiff regularly

---

[4]While the record indicates Plaintiff's long-standing problems with back pain, there is no record of Plaintiff specifically receiving treatment, other than continued pain medication, for these problems in 2004 or 2005. In fact, at Plaintiff's annual check-up on December 8, 2005, the attending physician remarked that Plaintiff is "having no problems" (R. 444).

[5]Plaintiff's claim that she did not receive individual therapy because there were no available therapists is not clear from the record which notes that: (1) 11/18/1997: Dr. VandenAkker urged Plaintiff to consider individual counseling (R. 416); (2) 02/12/2004: Dr. Valdes urged Plaintiff to begin individual counseling (R. 377); (3)05/12/2004: Plaintiff was again resistant to individual counseling; (4) 09/29/2004: Dr. Schultz noted that Plaintiff needed to undergo psychotherapy (R. 270); and (5) 12/27/2004: Dr. Valdes Stated that Plaintiff should begin individual counseling (R. 365).

attends church on Sundays and on Wednesdays.  Plaintiff's husband goes grocery shopping with her so that he can lift the heavy items and so items are not forgotten (R. 486-487).

Plaintiff stated that the pain in her back, hips, knee and ankle was present about half the time rating it 8 on a scale of 1 to 10 (R. 487).  Plaintiff uses Vicodin, and takes a number of psychotropic medicines, including Wellbutrin, Prozac and Klonopin (R. 485-86, 489-90).

2.     *Medical Evidence*

Plaintiff was seen on November 22, 1994, by  psychiatrist, Ron Melvin, D.O., who reported that Plaintiff made good eye contact, and had a normal gait, and no psychomotor agitation or retardation (R. 418-419).

On November 18, 1997, Plaintiff saw psychiatrist, Martin VandenAkker, D.O., ho noted that Plaintiff had chronic low-level unhappiness with frequent worsening of her symptoms which he termed double depression (R. 414-16).  Dr. VandenAkker suggested Plaintiff undergo treatment with medicine as well as individual and couple's therapy.

On February 10, 1999, Margaret Hickey, M.A. conducted psychological testing at North Central Community Mental Health, and noted a major area of concern with Plaintiff's angry outbursts are (R. 408-12).

On February 1, 2000, Plaintiff was treated at the Mercy Health Services North after she coughed and hurt her back (R. 340-41).

On January 8, 2002, Dr. VandenAkker noted that her affect again was near tears.  Plaintiff was given sleep medicine and strategies for dealing with her family.  On February 26, 2002, Dr. VandenAkker stressed to Plaintiff the need to take her medications (R. 405).  On August 13, 2002, Dr. VandenAkker noted that Plaintiff likely possessed a Dysthymic Disorder,

ADD and recurrent moderate depression (R. 403).  On November 12, 2002, he expressed concern about suboptimal compliance by Plaintiff (R. 399).  Plaintiff's mood problems were listed as "stable."

A Psychiatric Review Technique Form ("PRTF") completed on December 1, 2002, by K. Sheth, M.D., indicated that Plaintiff suffered from an affective disorder under Listing 12.04.  She was moderately restricted in the areas of daily living, social functioning and concentration (R. 216-229).

On December 4, 2002, Cecile Davidas, M.D., wrote that Plaintiff was restricted from pushing, pulling or lifting more than 25 pounds, she could not stand or walk for more than two hours, and she had been unemployable for more than 60 days(R. 396).

Plaintiff saw Dr. VandenAkker on December 17, 2002, and he noted that Plaintiff was "quite distraught" over her "having been laid off from another job."  Dr. VandenAkker told Plaintiff that he would have a very "difficult time filling out a form for Michigan Works that would keep her off work since daily structure has been very important for her and is important in terms of her self-confidence and self-concept."  Dr. VandenAkker also noted that Plaintiff's concerns are mainly circumstantial and when speaking of her depression she does so vaguely. His January 21, 2003, visit found that Plaintiff had a fairly marked improvement in mood and affect after 5-weeks on Prozac (R. 387).  Her grooming had improved, her eye contact was a 90%, and her affect was bright.

Plaintiff saw Vincent Schultz, M.D., on February 27, 2003, for bilateral knee and left hip pain and hearing difficulty (R. 325).  Dr. Schultz noted Plaintiff's obesity which limited her forward flexion to 45 degrees (R. 326).  Plaintiff requested disability for a hearing problem

which she noticed while volunteering at a local school (R. 325). Dr. Schultz noted that Plaintiff has "never had any trauma to the ears. . . no history of recurrent infections. . . never had a hearing exam."

On March 18, 2003, Plaintiff met with Dr. VandenAkker who found an improvement in mood with no sexual side effects from the Prozac in combination with Wellbutrin (R. 386).

On March 31, 2003, Plaintiff was examined at the Au Sable Medicine and Joint Center, P.C., by Joseph R.Yacisen, D.O., who reviewed X-rays that revealed L5-S2 degenerative disc disease with a narrowing of disc space (R. 208). While an X-ray of the knee revealed joint space narrowing, there was no evidence of sclerosing or subchondral cyst or osteophytic spurs.

On May 7, 2003, Plaintiff's medical records were reviewed by psychiatrist Sheth (R. 212). Dr. Sheth's assessment indicated moderate limitations in the areas of understanding and remembering detailed instructions and in maintaining attention and concentration (R. 213).

On September 16, 2003, Plaintiff returned to Dr. VandenAkker who noted that Plaintiff revealed numerous excoriations on her upper chest and arms (R. 384). She exhibited symptoms that might be consistent with, but do not meet the full-blown criteria for obsessive-compulsive disorder. On October 14, 2003, Dr. VandenAkker examined Plaintiff noting that the excoriation areas seemed to have healed, and noted that there seemed to be significant improvement in Plaintiff's depressive symptoms and obsessive-compulsiveness (R. 382).

At an October 30, 2003, re-examination, Plaintiff was treated by Dr. Yacisen who placed Plaintiff on Vioxx (R. 286).

On November 12, 2003, Plaintiff filled out a self-assessed function for the lower quarter in which she reported being unable to walk several miles, run two blocks, climb a flight of stairs,

balance on one leg, squat, kneel or lift up to 40 pounds (R. 293).

On November 25, 2003, Dr. VandenAkker diagnosed Plaintiff with stable depressive symptoms with some degree of obsessive-compulsiveness and some adult ADD symptoms (R. 381).

On December 19, 2003, Scott Monteith, M.D., a psychiatrist at Northern Lakes Community Mental Health, examined Plaintiff and wrote that Plaintiff was not able to continue with the Michigan Works program because she could not perform in a work setting (R. 380). Dr. Monteith noted that Plaintiff would be re-examined on January 15, 2004.

On December 29, 2003, Plaintiff met with Dr. Yacisen and she reported said that physical therapy had helped her slightly, and that Vioxx had helped her significantly (R. 285).

On January 16, 2004, Dr. Schultz examined Plaintiff and diagnosed her with a nasal abrasion due to compulsive behavior (R. 281-82). The examination showed excoriation on the right and left naris with the left Kiesselbach's plexus being markedly excoriated (R. 281). Dr. Schultz thought Plaintiff should meet with the community mental health clinic for a medication change (R. 282).

On February 12, 2004, Plaintiff met with John Valdes, M.D., made a presumptive diagnosis of anxiety disorder, moderate to severe stressor and he thought Plaintiff's GAF was 60 (R. 377).[6] Dr. Valdes urged Plaintiff to begin individual counseling.

_____

[6] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or

A PRTF, completed on March 2, 2004, by a non-examining psychologist, Ronald Marshall, Ph.D., L.L.P., found mild limitations in social and daily living activities and moderate concentration issues (R. 240).

On April 3, 2004, Plaintiff was examined by Michael Simpson, D.O., at the request of the Michigan Disability Determination Service (R. 248-51). Dr. Simpson found no abnormalities during his examination and concluded that Plaintiff was suffering from back and knee pain, possessed a mild limp on the left and moderate difficulty squatting (R. 250).

A Physical RFC form completed on April 16, 2004, concluded that Plaintiff could frequently lift no more than five pounds but that she could perform sedentary work with a sit/stand option (R. 253-258).

On May 12, 2004, Dr. Valdes observed that Plaintiff's mood and anxiety had been fairly stable (R. 375). Plaintiff was given a presumptive diagnosis of an anxiety disorder. Dr. Valdes noted that it seemed unlikely that Plaintiff's picking was a compulsion as Plaintiff picks "when it itches." Plaintiff was once again resistant to individual counseling.

On August 3, 2004, Dr. Schultz met with the Plaintiff who noted that her neurotic excoriations and depression were improved (R. 275). On August 3, 2004, Plaintiff also was evaluated by an audiologist who found that she had a mild to moderate mid-frequency bilateral hearing loss (R. 261). On September 13, 2004, Plaintiff complained of fatigue, and Dr. Schultz thought that Plaintiff's fatigue might be due to a sleep disturbance with excessive snoring and

---

major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id*. A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id*. A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id*.

possible sleep apnea (R. 273-74). On September 29, 2004,. Dr. Schultz increased Plaintiff's medication dosage and strongly recommended she undergo psychotherapy (R. 270).

On October 27, 2004, Plaintiff was examined by Carl F. Schubert, M.D., who noted that Plaintiff had stopped taking all of her medicines, and possessed significant problems with depression and anxiety (R. 269). Dr. Schubert discussed the case with Dr. Schultz, who thought Plaintiff had an obsessive-compulsive disorder and stated that patient would benefit strongly from medication and mental health input.

On November 1, 2004, Plaintiff returned to see Dr. Valdes who found that Plaintiff's hygiene and grooming were decreased, her mood was down, and her insight and judgment were below average (R. 366). Dr. Valdes diagnosed Plaintiff with a depressive disorder and assessed her GAF at 50.

On November 17, 2004, Dr. Schubert examined Plaintiff, and reported being at a loss as to the cause of Plaintiff's tearfulness, as he did not think Plaintiff "has a significant psychological illness" (R. 267).

On December 27, 2004, Plaintiff told Dr. Valdes that her anxiety had worsened and that she had been more tearful than usual, at least in part because she thought her daughter had developed a poor opinion of her (R. 365). Dr. Valdes stated that Plaintiff should begin individual counseling and that she might want to have her family doctor change her medicine.

On January 11, 2005, Dr. Schultz examined Plaintiff and noted that Plaintiff "is doing much better on the BuSpar and Wellbutrin (R. 264). On January 25, 2005, Dr. Schultz met with Plaintiff who reported increased crying and feelings of anxiety (R. 264). Dr. Schultz altered her depression medicine, and noted Plaintiff's elevated blood pressure. Plaintiff was discharged

from the Northern Lakes program on June 11, 2004, due to her stable condition (R. 371-373).

On March 10, 2005, Plaintiff was seen by David Riddle, D.O., who noted that Plaintiff's otherwise unspecified depression appeared worse and that her anxiety disorder appeared about the same (R. 362).

On April 7, 2005, Plaintiff was seen by the Grayling Clinic Plaintiff, and she reported that the previous day's panic attacks were so bad that she had to visit the community clinic (R. 360).

On May 10, 2005, Plaintiff met with David Forsythe, M.D., a psychiatrist, who noted that Plaintiff has regular symptoms of panic, and made diagnoses of a single episode of major depressive disorder, panic disorder with agoraphobia and dependent personality (R. 359). On June 8, 2005, Plaintiff returned to Dr. Forsythe who diagnosed a major depressive disorder, improved panic disorder, and a dependant personality disorder (R. 358). Dr. Forsythe noted that Plaintiff's sleep and appetite are improved, and she has stopped picking at her skin. On July 8, 2005, Plaintiff was seen along with her husband by Dr. Forsythe, and while tearful throughout, Plaintiff was pleasant and cooperative (R. 441). On August 1, 2005, Plaintiff was again seen by Dr. Forsythe who noted that Plaintiff takes her medication but continues to be anxious (R. 440).

On July 7, 2005, Dr. Schubert noted that Plaintiff's prescription for 2 mg of Estrace, was a "pretty high dose," which did not seem to be working (R. 424).

On August 1, 2005, Plaintiff returned to Dr. Schultz for a depression recheck (R. 422). Dr. Schultz wanted Plaintiff to receive mental health treatment from one person given that multiple providers led to changes in medication without the knowledge of other care providers.

On August 29, 2005, Plaintiff told Dr. Forsythe that she had noticed a very minor

improvement in her anxiety level due to medicine changes (R. 439). Dr. Forsythe noted that Plaintiff is able to laugh and smile much better than in past sessions and exhibits no evidence of psychosis.

On September 12, 2005, Dr. Schultz reported that Plaintiff's depression was improved (R. 421).

On September 28, 2005, Dr. Forsythe recorded that Plaintiff continued to show some improvement (R. 438). Plaintiff was still somewhat disheveled, but maintained eye contact better than she had done previously. No tears, psychosis or suicidal ideation was noted. On November 30, 2005, Plaintiff showed some minimal improvement but reported experiencing some side effects from her medications (R. 437).

On December 8, 2005, Dr. Schubert examined Plaintiff at her annual examination noting that Plaintiff is "having no problems" and seems more upbeat than usual (R. 444). Dr. Schubert noted that Plaintiff's medication keeps her drowsy, but "otherwise she feels pretty good." Dr. Schubert noted that Plaintiff is "going to have a permanent disability hearing in the near future, but no other significant problems presently," and concluded that Plaintiff underwent a "normal exam" revealing an alert, oriented, white female in no acute distress.

On February 1, 2006, Plaintiff returned to see Dr. Forsythe who reported that Plaintiff was in a much better mood and continued to lose weight (R. 449). Dr. Forsythe noted that Plaintiff's improvement was readily available as Plaintiff laughed more actively and initiated talk for most of the session. He noted that there is no evidence of psychosis, eye contact was very good and there is not psychomotor retardation or agitation.

**3.** **Vocational Evidence**

Vocational expert ("VE") David Holwerda testified that Plaintiff's prior work performing circuit board assembly was unskilled, sedentary and did not acquire any semi-skills (R. 464-66). VE Holwerda stated that Plaintiff's other job doing assembly work was classified light and unskilled according the Dictionary of Occupational Titles ("DOT"), but as Plaintiff performed the job it would be sedentary and semi-skilled (R. 467).

ALJ Decker asked VE Holwerda a hypothetical question, assuming someone bearing Plaintiff's characteristics that physically has back and knee pain, and limitations in walking, standing, sitting, bending and lifting as well as requiring a daily nap from 11 a.m. to 1 p.m and mentally is unable to maintain focus for simple repetitive takes and would have problems interacting with the public or a small group of co-workers, would such a person be able to work full-time? VE Holwerda stated that the down-time and inability to do even simple work would make such an individual unable to work (R. 490-91).

ALJ Decker told VE Holwerda about an assessment performed by a non-examining physician for the State of Michigan who found that Plaintiff could perform a limited range of light work with lifting up to 20 pounds occasionally or 10 pounds frequently, Plaintiff being on her feet or sitting about six hours in an 8 hour day with occasional postural changes. The ALJ then asked VE Holwerda if such restrictions would allow a person with these characteristics to perform Plaintiff's three prior jobs at Reptron, and VE Holwerda stated that such a person could perform these jobs (R. 491).

ALJ Decker discussed Exhibit 8F, which was from a non-physician at the state agency which allowed sedentary work, lifting (less than 10 pounds occasionally, less than 5 pounds frequently), being on her feet 2 hours out of an 8 hour day with alternation between sitting and

standing to relieve pain and discomfort. Such a restriction also includes "occasional" in the postural categories, except never climbing ladders, ropes or scaffolds (R. 491-92). ALJ Decker then asked whether these restrictions would allow a hypothetical person to perform any of Plaintiff's three prior jobs at Reptron. VE Holwerda replied that it would allow such a person to perform the printed circuit board assembler and the parts assembly jobs (R. 492). VE Holwerda stated that the soldering job could not be performed as it may have required lifting more than 10 pounds (R. 493).

ALJ Decker provided another hypothetical to VE Holwerda. Referring to Exhibit 11F, the ALJ referenced Plaintiff's right shoulder pain, subsequent treatment of that shoulder, and restrictions on pushing, pulling, lifting more than 25 pounds; and limited standing and walking for less than 2 hours (R. 495). ALJ Decker then asked VE Holwerda if such restrictions would allow a hypothetical person to perform any light jobs. VE Holwerda responded that if there are no limitations as to upper lower extremity use, then such a worker could do a portion of jobs that are performed sitting down and considered light because of pace. These would include machine operators (1,000), Lear jobs[7] (2,000), inspectors/sorters (500), and packagers (500) (R. 496). VE Holwerda noted that nothing in the DOT conflicts with these jobs (R. 498).

Turning to Plaintiff's mental health and capabilities, ALJ Decker referred to Exhibit 3F (R. 212-15) where Dr. Sheth noted Plaintiffs limitations for understanding and remembering detailed instructions as well as responding appropriately to changes in work settings (R. 496). This exhibit stated that Plaintiff could perform simple, unskilled work on a sustained basis. VE

---

[7] It is unclear what the reference to Lear jobs means. Plaintiff checked for defective part for containment at Lear (R. 151 & 456), but this was temporary work and not considered past relevant work.

Holwerda said that these limitations would rule out Plaintiff's prior work as a circuit board assembler. VE Holwerda clarified that there are two levels of unskilled work: SVP levels 1 and 2. SVP level 1 jobs require simple demonstration whereas SVP level 2 jobs can take up to 30 days to learn. VE Holwerda believed that Plaintiff could perform SVP level 1 jobs, but was precluded from her prior work noting mistakes Plaintiff made on the circuit board job which was SVP level 2 (R. 497 *See also* R. 23). Further restrictions on Plaintiff referred to in Dr. Marshall's PRTF included her problems performing within a schedule, maintaining regular attendance, being punctual and avoiding without interruptions from psychological limits. These were determined to bar Plaintiff from performing her prior work, while allowing her to do other unskilled jobs (R. 497-98). The ALJ specifically asked VE Holwerda whether the psychological limitations noted in Dr. Sheth's and Dr. Marshall's assessments would "allow her to do the unskilled other jobs that you've identified at the light level" to which ALJ Holwerda responded they would (R. 498). Dr. Marshall noted a residual ability to do unskilled work on a sustained basis (R. 242). One might think that adding mental limitations restricting work to SVP level one jobs it would reduce the number if not the ability, of jobs the hypothetical worker could perform.[8]

The VE noted limiting jobs to SVP level one would leave 700 machine operator jobs, 800 clerical, 400 laborers and 200 inspectors, testers and sorters at the sedentary level (R. 499) On cross-examination, VE Holwerda was asked if a person with hearing problems would have

---

[8] This is somewhat inconsistent with VE Holwerda's later testimony that restricting jobs to unskilled SVP level one jobs reduced jobs to about 40% of unskilled jobs (R. 498). When VE Holwerda identified the 4,000 light jobs, the ALJ hod only discussed physical limitations, and not yet introduced the mental limitations into his questioning.

trouble with some of these jobs (R. 499). VE Holwerda responded that the DOT does not list hearing as a necessary component, and while making the job more difficult, hearing loss would not preclude employment or reduce the number of jobs available to the Plaintiff (R. 499-500).

Further on cross-examination, VE Holwerda was asked if an individual was restricted to no standing over two hours, no sitting over two hours and no lifting over five pounds would preclude employment (R. 500). VE Holwerda replied that such limitations would preclude employment (R. 501). No questions were asked involving limitations caused by Plaintiff's psychiatric impairments.

**4.      ALJ Decker's Decision**

In a Decision dated June 27, 2006, ALJ Decker found that Plaintiff has not engaged in substantial activity since December 19, 2003, the date she filed her current application for Supplemental Security Income (R. 25).

ALJ Decker noted that on December 19, 2003, Plaintiff was 47 years of age, and was considered a younger individual. Now that Plaintiff has attained the age of 50 she is considered an individual closely approaching advanced age under 20 C.F.R. §416.963(d). If she were limited to sedentary work she would be considered disabled at age 50 under grid Rule 201.12, which in fact ALJ Decker noted at the hearing (R. 498).

ALJ Decker found impairments including degenerative disc disease of the lumbar spine, bilateral mid-frequency hearing loss, major depressive disorder, and anxiety order - not otherwise specified. Yet, these did not meet or medically equal any of the listed impairments in Appendix I, Subpart P, Regulation No. 4. Further, Plaintiff has not been under a "disability" as defined by the Social Security Act at any time through the date of decision (R. 26)

ALJ Decker concluded that Plaintiff's claim of total inability to perform sustained work was not entirely credible as Plaintiff had the RFC to lift, carry, push and/or pull no more than 25 pounds occasionally; stand or walk for a total of less than two hours in an eight hour work day; and maintain concentration to execute no more than simple, routine job tasks which can be learned by demonstration or within one day (R. 25).

ALJ Decker determined that Plaintiff could not perform her past relevant work, and the skills acquired by Plaintiff in past relevant work are not transferable to activities within her RFC. Yet, ALJ Decker noted that Plaintiff has the RFC to perform a limited range of light work, per Medical-Vocational Rules 202.14 and 202.21, he determined that Plaintiff could perform a significant number of jobs in the national economy (R. 26).

## II. ANALYSIS

### A. <u>Standards of Review</u>

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[6]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.**　　**Factual Analysis**

Plaintiff raises one challenge to the Commissioner's decision: ALJ Decker erred by finding that the 4,000 jobs listed by VE Holwerda constituted a significant number of jobs.

When examining whether the Plaintiff is disabled, the five-step, sequential evaluation of disability must be followed in set order.  20 C.F.R. §404.1520.  Plaintiff's counsel acknowledges that ALJ Decker correctly followed the first four steps of this process (Dkt. # 13, p. 14).  Regarding the fifth step, ALJ Decker analyzed Plaintiff to determine whether Plaintiff's impairment(s)  prevented her "from making an adjustment to any other work."  20 C.F.R. §404.1520(g).  Plaintiff'S counsel has not challenged ALJ Decker's decision that Plaintiff could adjust to perform light exertional work., nor has counsel challenged the number of such jobs identified by VE Holwerda.

---

[6] *See, e.g.*, *Varley v.  Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir.  1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v.  Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir.  1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v.  Heckler*, 810 F.2d 786, 790 (8th Cir.  1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir.  1975); *Noe v.  Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

The only claim under review is whether the number of jobs that Plaintiff could perform are present in such number that they should be considered significantly present in the national economy.[7] While some Circuits have tried to quantify what constitutes a significant number of job in the national economy, the Sixth Circuit has refrained from using precise numerical criteria to make that determination. *Hall v. Bowen*, 837 F.2d 272 (6th Cir. Jan. 20, 1988)( upheld 1350 jobs in a 9-county area as a "significant number"); *Barker v. Secretary of Health and Human Services* 882 F.2d 1474, 1476 (9th Cir.1989) (2,466 jobs in the local economy constitutes a significant number); *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986) (approximately 4,250 jobs in the local economy constitutes a significant number); *Jenkins v. Bowen*, 861 F.2d 1083 (8th Cir.1988) (500 sedentary security jobs within region in which disability income claimant lived was a significant number of jobs particularly); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987)( 1,600 general appliance repair jobs in the State of Georgia and some 80,000 such jobs nationwide constitutes a significant number); *Lee v. Sullivan*, 988 F.2d 789, 792-74 (7th Cir. 1993) (1,400 positions in the greater Milwaukee metropolitan area is a significant number of jobs.); *Nix v. Sullivan,* 744 F.Supp. 855, *863 (N.D.Ind. 1990), affr'd 1991 WL 118534, *3 (7th Cir 1991)( 675 jobs in the regional area constitutes a significant number*); Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir.1992) (found an occupation base reflecting

---

[7]42 U.S.C. 423(a)(2)(A) reads: "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. *For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country* (emphasis added).

650-900 statewide jobs was small enough to put the issue in a gray area requiring a remand in order for the ALJ to address the question a "significant" number of jobs under 42 U.S.C. § 423(d)(2)(A) which the federal courts could then review); *Allen v. Barnhart,* 357 F.3d 1140, 1145 (10th Cir. 2004)(found 100 jobs in the regional economy insignificant.); *Waters v. Secretary of Health and Human Services*, 827 F.Supp. 446 (W.D.Mich.,1992) (holding that 1000 jobs, all of which required at least 180 miles of travel, in a tangentially related field did not constitute a significant number of jobs).

The *Hall* court rejected one of Plaintiff's arguments using percentages of jobs in Michigan . *Hall* clarified that "significant number" of jobs refers to the number, not percentage, of the jobs in a given area. It is important to note that it is the role of the Commissioner to define his terms and the role of this court to review them as to whether they are reasonable in light of the statute and whether an ALJ's applications findings regarding them is supported by substantial evidence. *Trimiar* 966 F.2d at 1329. The Sixth Circuit in *Hall* set out the factors that should be considered when determining whether a significant number of jobs are available:

> A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of traveling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on. The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation.

*Hall*, 837 F.2d at 275.

While *Hall* may have been referring to the standards a district court judge using the term "trial judge" the cases from which *Hall* borrowed this language make it clear it is the ALJ who has the discretion to decide. *Trimiar,* 966 F.2d at 1330; *Allen v. Barnhart* , 357 F.3d at 1144.

In evaluating ALJ Decker, it is significant that his finding is that the evidence establishes "a significant number of jobs in the national economy"( R. 26). In his questioning to VE Holwerda, ALJ Decker did not use the normal hypothetical question and its careful structure. Rather he merely discussed with VE Holwerda the mental evidence limiting jobs after ALJ Decker identified the 4,000 light jobs. In asking about what jobs might be available, ALJ Decker did not limit it to the regional economy, nor did VE Holwerda indicate the 4,000 jobs were regional and not national. In his decision, ALJ Decker specifically states that he asked VE Holwerda "whether or not there are a significant number of jobs in the national economy that the claimant can perform given her residual foundational capacity and other vocational factors." The transcript does not support that ALJ Decker did refer to the national economy. Nonetheless, the record before us has a decision where ALJ Decker found 4,000 jobs in the national economy that Plaintiff could perform. When asked at the hearing if the addition of mental limitations of Drs. Sheth and Marshall to the physical ones in the jobs question (upon which the 4,000 number was originally based) would allow Plaintiff to do the jobs identified, VE Holwerda indicated "yes." Yet, for reasons noted in footnote seven above, it is not clear if VE Holwerda's answer meant only that Plaintiff could do all of the *types* of jobs identified, or also all of the *types* and *numbers* of such jobs. The original question did not include the mental limitations, and thus did not implicitly limit the jobs to SVP level one unskilled jobs. Nor did it exclude SVP level two jobs because such levels of unskilled jobs were not discussed at the hearing until later. VE

Holwerda did note later that SVP level one were only 40% of unskilled jobs, and when later asked about SVP level one sedentary jobs, he gave greatly reduced numbers in response. Thus, it is unclear why the 4,000 light jobs would not also be reduced if limited to SVP level one unskilled jobs.[8] Whatever the answer to these questions, it cannot be said that 4,000 jobs in the national economy is a significant number. All of the cases cited above clearly refer to numbers in the respective regional economies. Thus, they are no support to uphold a decision based on only 4,000 jobs in the national economy. Thus, given the confusion and uncertainties noted, it cannot be said there is substantial evidence to uphold ALJ Decker's decision and the decision must be overturned.

*Faucher v. Sec'y of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that after finding reversible error it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher* citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

In this case "all essential factual issues" with respect to the number of jobs Plaintiff can perform in the regional economy has been *not* been resolved with regard to the number of light unskilled jobs Plaintiff can perform in the regional economy including the impact of Plaintiff's

---

[8] It may be VE Holwerda only included SVP level one unskilled jobs in his 4,000 light unskilled jobs, but that was not required by the "hypothetical" as developed to that point, nor is it otherwise clear from the record. While ALJ Decker thinks he asked about jobs in the national economy, he did not and it is also unclear whether VE Holwerda 4,000 figure may actually have been referring to jobs in the regional economy.

mental limitations on her vocational capacity limiting her to SVP level one unskilled jobs.  Nor

is this a case where "proof of disability is overwhelming, or proof of disability is strong and

evidence to the contrary is lacking."

## III.    RECOMMENDATION

For the reasons stated above, it is recommended that Defendant's Motion for Summary

Judgment be **GRANTED** and Plaintiff's motion be **DENIED**.  Either party to this action may object

to and seek review of this Report and Recommendation, but must act within ten days of service

of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2).

Failure to file specific objections constitutes a waiver of any further right of appeal.  *United*

*States v. Walters*, 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v.*

*Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but

fail to raise others with specificity will not preserve all objections that party might have to this

Report and Recommendation.  *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

Note: any objections must be labeled as "Objection #1," "Objection #2," etc.; any

objection must recite precisely the provision of this Report and Recommendation to which it

pertains.  Not later than ten days after service an objection, the opposing party must file a

concise response proportionate to the objections in length and complexity.  The response must

specifically address each issue raised in the objections, in the same order and labeled as

"Response to Objection #1," "Response to Objection #2," etc.

DATED: November 30, 2007          s/ Steven D. Pepe
                                  STEVEN D. PEPE
                                  United States Magistrate Judge


CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2007 , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification to the following: Janet L. Parker, AUSA, James R. Rinck, Esq., Commissioner of Social Security , and I hereby certify that I have mailed by U.S. mail the paper to the following non-ECF participants:  not aplicable

                                  s/ James P. Peltier
                                  James P. Peltier
                                  Courtroom Deputy Clerk
                                  United States District Court
                                  600 Church St.
                                  Flint, MI 48502
                                  810-341-7850
                                  pete_peltier@mied.uscourts.gov